May it please the Court. My name is Kurt Olson. I represent the Plaintiff Appellant. I request to reserve three minutes for rebuttal. This case is a far cry different from the argument you just heard in terms of Pricewaterhouse Cooper's conduct, which in our case involved a different office of PWC. We realize that. Yes, Your Honor. Before the SEC mandated that because of the improper accounting for the $7.7 million Blue Cross Blue Shield of New Jersey receivable, Pricewaterhouse Coopers acknowledged internally that that very same accounting was improper. Nonetheless, they issued an unqualified opinion on PHP's Fiscal Year 1997 financial statements. This is not an issue over which reasonable accountants could differ. The particularized allegations which we have supported with the plaintiff's contemporaneous documents raise a strong inference that first, PWC actually knew or with deliberate recklessness disregarded that PHP improperly recorded that receivable, which had no economic substance, in Fiscal Year 1995 so that they could report their first profit in three fiscal years. Second, that PWC actually knew that PHP falsely stated in its Form 10-Q for the year 1997 that they had actually been paid for that receivable. And third, that PWC actually knew that it was improper to treat that receivable, which in fact had not been paid, as an intangible asset. And the effect of that was to allow PHP to amortize it off its books so that it did not have to take an immediate charge to income, which is exactly what happened upon the restatement once the SEC uncovered what was going on. This whole accounting shell game began to unravel when the SEC just asked a very simple question. They asked PHP, why did you report one purchase price for the Blue Cross Blue Shield of New Jersey facilities in your third quarter 1997 Form 10-Q, the same one where they said they had been paid for that receivable, and report a different higher price in your Fiscal Year 1997 Form 10-K? And with that simple question, this entire shell game began to unravel. The response by PHP, which PWC reviewed because the SEC comment letters were critical matters, as was the Blue Cross Blue Shield of New Jersey accounting, I might add. It was neither prompt nor complete. The fact that we've made allegations that those responses to the SEC were incomplete and misleading, in and of itself raises a strong inference of cyander in accordance with this Court's previous decision in Ray Software Toolworks, where in that decision the Court reversed the grant of summary judgment as to Deloitte and Touche over similar issues of providing misleading responses to the SEC in terms of comment letters. Taken together, Your Honor, all of these allegations raise a strong inference of cyander with respect to this transaction. And I might add, the defendants make one argument with respect to this. They try to claim, or argue, that the $7.7 million restatement in Fiscal Year 1997, where the intangible assets that were on the company's balance sheet were reduced by $7.7 million, was immaterial. That's incorrect, Your Honor. The defendants cite a portion of the restated Form 10-K, and what it actually states in that Form 10-K is that there were revenue was not adjusted in Fiscal Year 1997. It was the intangible assets. The same particularized allegations that we have pled with respect to the Blue Cross Blue Shield of New Jersey transaction, which spanned three fiscal years, are supported by contemporaneous documents with respect to the D.C. receivables, which again was a series of contracts that were under what's called the 1991 contract, the 1994 contract, the 1996 contract, and the 1997 contract. What's important is that right from the beginning, when PwC took over as the auditor for PHP, after KPMG refused to audit PHP further, and just two months earlier had issued a reportable condition letter questioning management's accounting decision-making process, rather than act as an independent skeptical auditor, PricewaterhouseCoopers said, and I quote, in their proposal to serve, that they would use their intimate familiarity with district officials to negotiate, advocate, and maximize collectability of these very receivables that they were charged with auditing independently. That's right from the beginning. In their first audit, fiscal year 1995, they acknowledged in their audit plan the rate differential. And the rate differential, as we have pled with particularity, is the difference between what the district was contractually obligated to pay, and willing to pay, and the higher rate, which is what PHP recorded its receivables at. And it's important to note that this is not just an issue over the CAVAL study. As we pled at paragraph 150 of our complaint, PHP not only employed unilaterally the CAVAL study, which the district would not pay, but they employed an inflation factor that they themselves determined on top of it. CAVAL plus, if you will. Furthermore, PricewaterhouseCoopers did not just say that these receivables were recorded properly under GAAP. They went one step further. They certified in the notes to the consolidated financial statements, which are part of the audit, and part of what they opine on, that these receivables were conservatively estimated, which is in and of itself a false statement. So not only did they say that these receivables were proper under GAAP, they took one step further, Your Honor, and said that they were conservative, all the while knowing that there was a rate differential between the lower rate that the district said they would pay, and the higher rate at which PHP continued to record these receivables. PricewaterhouseCoopers' argument as to why it was reasonable for the accountants to say these receivables were proper under GAAP, taking aside that they were conservative, which is a different issue, because they clearly were not, PricewaterhouseCoopers makes three arguments in their brief. They say, first, that the district paid other HMOs the CAVAL and PricewaterhouseCoopers enacted legislation in April of 1996 converting these contracts retroactively to full risk contracts. That the district never argued that the PLUM study applied retroactively to receivables under the 1991 and 1994 contracts. And third, they argue that the CAVAL was the only study, and we know because of the PLUM study, that eventually was not the only study. All of those justifications are false. If you look at PWC's supplemental excerpts of the record at 322, which is the 1998 Form 10-K, which contains the same new disclosure that the SEC mandated in the restated Fiscal Year 97 Form 10-K-A, just a few months earlier issued, it says the following, and this is PHP's own statement, that the district paid other HMOs the same rate in Fiscal Year 1994. That's very important because PWC became the auditor in Fiscal Year 95 and then continued on. What makes this even more important is if you look at our excerpts of the record at 292, which contains the earlier response of PHP to the SEC's inquiry on this matter. The SEC was asking, please disclose the underlying facts which may cause this receivable not to be collected. And in that response, which again PWC reviewed, because that response was a critical matter and that's identified in the audit plan, PHP stated that the district paid other HMOs in Fiscal Years 94, 95, and completely left out of the final statement. And we would submit, Your Honor, that because that is a critical fact to their defense, that the absence of that fact further supports our inference of CNTR, in addition to the fact that this is a clear allegation where PHP was misleading the SEC on that response. You will also note at SER 322 that PWC's argument that the district did not take the position that the Plum Study applied retroactively is false. It's specific... Do you take the position that the publication of false accounting data per se meets the CNTR requirement? No, Your Honor, I don't. As this Court held in... You're in agreement with the Court then that it is two different elements. You have the fact of the misstatement. Now you have to show that the statement was deliberately misleading, right? Yes, Your Honor. And you have to do it from a pleading standpoint. Yes, Your Honor. Okay. And as this Court noted in In re Dao System, citing In re McKesson, while mere allegations that GAAP was not followed are insufficient by themselves to plead CNTR, particularized allegations... GAAP's a wonderful concept as to whether it's statutory or regulatory. Anyway, it's the standards by which the accounting profession usually and customarily practices. Yes, Your Honor. So you're not violating any statute by changing the accounting standard if that's what the profession desires to do. It's like lawyers saying this conduct's unethical one week and next week you find it's not in the ethics code anymore. You know, that happens. Well, I think the difference is that GAAP has certain requirements that must be met. And as the Court noted in Dao, that particularized allegations of GAAP violations can raise a And we have chapter and verse exactly how PwC knew that PHP was misstating its receivables at the time that they were stating that they were properly recorded under GAAP and further qualifying them that they were conservatively estimated. The PwC does not dispute in its brief that after 1996, when the GAAP Act was passed, in 1996, when the Plum Study came into being, that all the receivables recorded after that when the district said, we're not paying anything but the Plum Study. PwC does not dispute that they actually knew that before they completed their fiscal year 1996 audit, that there was no disclosure of that. And it's important, Your Honor, to look at the FAS 5 requirements for impairment to receivables and disclosure, because they're two different issues. And FAS 5 has been reprinted in its entirety by PwC at SER 371. And the specific page that I'm referring to is 374 and 375. There's what FAS 5 requires. An impairment is when the loss due to the receivable is probable, and second, that it is estimatable. And probable is defined at FAS 5, which are the rules that govern the accountants. They've been around for a long time. These are basic accounting principles. Probable means likely. Even PwC submitted in the record at SER 393 the fact that the Plum Study rates were law. They were in the law before the March 1997 rejection of the settlement, preliminary settlement, by the CFO. And they don't dispute that they knew that. What is interesting is that we can also show that they actually knew that rate, we plead evidence with particularity, prior to the fiscal year 1996 audit. If you look at our excerpts of the record 307, that is a letter from PHP to Mr. Paul Offner, who was the head of the D.C. Health and Human Services. Paul Offner is also identified as a point of contact on that regulation that I just cited at SER 393. That August 20th letter refers to a July 3rd letter, which is prior to the fiscal year 1996 audit being completed, from PHP to the district protesting the Plum Study rates. And it's the exact rate that's in that letter, as of July 3rd, that PHP's protesting, that's enacted into law. At our excerpts of the record, we introduced a letter from Cooperson Library, which later became PWCU after the merger, telling PHP, we must have a meeting with Paul Offner about these receivables or we can't complete the audit. So it's reasonable to infer, Your Honor, that because they completed the audit, that they had that meeting. And it is inconceivable that given the dispute that was going on between PHP and the district about the Plum Study and the rates that were going on, that this was not discussed. I would also add, PWC makes the argument that the $18.9 million settlement came without, or rejection by the CFO, where he called it robbery, came without warning. And this was, again, in March of 1997. Well, given the wealth of evidence, particularized allegations, that the Plum Study was what the district was going to pay, and long before that, it certainly did not come without warning. We've also put evidence into the record and referred to in our complaint, for instance, of PHP's presentation to the Audit Committee about their fiscal year 96 audit, in which they specifically discuss the new revenue recognition policy, the impact of the new legislation, which convert all these contracts retroactively into risk contracts. Third, the $18.9 million settlement had absolutely nothing to do with any receivable recorded after fiscal year 95. In other words, beginning in 1996, when the Plum Study was in effect, that preliminary settlement, which was rejected and characterized as robbery, had nothing to do with that. That was only for fiscal years 92 and 94. That's important because we have also alleged that all the receivables that were recorded in fiscal year 96 and 97 were also falsely inflated. So the defendants cannot rely in any way on that preliminary settlement as a justification that their earlier determination that the receivables recorded in fiscal years 96 and on were reasonable. The capitation rate was a big deal to analysts, and we actually pled a specific analyst report that was issued two days after the district CFO rejected the settlement, saying, well, the one-time collection of this receivable is important. What is really important are the capitation rates at which PHP has been recording revenues. He knew nothing of this dispute, and we don't find out about this dispute until after the SEC gets a hold of it and forces disclosure of it. And that's where we allege, at a minimum, the disclosure of this dispute was mandated by gas and gas. And here's where we go back to FAS 5, because FAS 5 has an impairment and a disclosure issue. And at SCR 374, 375, it specifically states that in terms of impairment, that an impairment will be disclosed if you don't meet the requirements for actually taking a charge of impairment, which is probable and estimatable. It will be disclosed when one or both of those requirements are not met. And it says specifically, if it's not probable, it will be disclosed if it's reasonably possible. Reasonably possible is defined as more than remote, but less than likely. So even though you don't necessarily have a violation where the receivable has to be written off, you have to disclose a dispute in those situations. And given the wealth of our allegations, it certainly was more than remote that this dispute was going to occur, given the district's absolute refusal to pay these receivables, the position that they were taking in terms of that they were not contractually obligated to pay, and the fact that the Plum Study was enacted into law long before this dispute ever became public. I do, Your Honor, so I'm going to sit down. Thank you, Your Honors. Dean Kitchens for the defendant, Napoli, and person of interest, PricewaterhouseCoopers. May it please the Court. This is an appeal from the district court's dismissal of the third amended complaint. That means that there were four separate complaints that were filed before we got here today, and that the district court, in reviewing the various complaints, and most recently the third amended complaint, issued not a short minute order incorporating, by reference, our arguments, but rather a 20-plus page opinion analyzing in detail what the court found deficient in this case. And we embraced that decision. Now, what's typical in these motion to dismiss cases under the PSLRA is that there has been no discovery, because there's a statutory prohibition on conducting discovery until there's a complaint on file. But what's unique about, or unusual, I guess I should say, about this case is that the plaintiffs here had access to the documents and evidence, which most plaintiffs are not given access to in these kinds of cases, because PHP was bankrupt and they settled with the plaintiffs and got, presumably as a result of that, a lot of information. And paragraph one in their complaint says that they have conducted an extensive analysis of, I think it's thousands of pages of internal PHP, KPMG, and somehow PWC documents. So this is a well-investigated case, which they've had ample opportunity to plead, and the district court has found more than once, and most recently on the motion to dismiss the third amended complaint, lacks a sufficient allegation of scienter. Let me talk a little bit about the legal framework and the scienter requirement, because I think we all agree that's a core issue in this case. Because it's a 10b-5 case, and because we're under the PSLRA, and because we're under the Securities Exchange Act of 1934, scienter is a required element of this pleading. And that means that the plaintiffs have to allege, with particularity, facts raising a strong inference of either intentional misconduct or deliberate recklessness. The cases that interpret scienter are extensive. One of the leading ones is the Hockfelder case, Ernst & Ernst v. Hockfelder in the United States Supreme Court, that held that scienter is a mental state embracing the intent to deceive, manipulate, or defraud. And in this court's Silicon Graphics case, this court addressed the definition of deliberate recklessness. And I think it's important that we consider the language there, because it, I think, controls the outcome of this case. It says, and I'll quote, Our definition of recklessness, as taken from the Sunstrand case, that's a Seventh Circuit case, strongly suggests that we continue to view it as a form of intentional or knowing misconduct. We use the words known and must have been aware, which suggest consciousness or deliberateness. Indeed, we expressly acknowledged our own prior statement that recklessness is a form of intent, rather than a greater degree of negligence. And the Supreme Court's statement that recklessness, in the context of 10b, is a form of intentional conduct. Now, that means, of course, that allegations of negligence are not enough to state a claim under Section 10b, that allegations of gross negligence are not enough, that allegations of excusable negligence is not enough. And indeed, if this had been a jury trial, with a burden of proof beyond a reasonable doubt, and a finding that there had been gross and inexcusable negligence, if that had been a conclusion, that would not be enough to impose liability under Section 10b. To state a 10b-5 claim, the plaintiffs have to allege that facts which raise a strong inference of intentional or knowing misconduct. And, as I said, they had several chances to do so and came up short. Now, another very significant aspect of this case is the fact that this is a case against the auditor, PricewaterhouseCoopers, not against the issuer, PHP Healthcare. And the Third Amendment complaint is full of allegations about what it is that PHP did. I even heard counsel, in his argument, talk about PHP did this and PHP did that, and referring to what PHP said in its disclosure documents. We are representing the auditor here, PricewaterhouseCoopers. And the fact that the PHP CFO maybe did accounting, let's assume he did improper accounting, maybe he presented the financial statements, the company presented its financial statements improperly, let's say that the company booked its revenues improperly, and let's say that it made disclosures which were improper. Now, PwC, as the auditor, made only the statements about its audits and its reviews that are required under the professional standards. PricewaterhouseCoopers said the financial statements present fairly, in material respects, the financial position of PHP in accordance with GAAP. That opinion is based on an audit that PricewaterhouseCoopers did in accordance with generally accepted auditing standards. So the issue here is whether those statements were made with Scienter. If, for example, PricewaterhouseCoopers violated GAAP, the generally accepted auditing standards, and was grossly negligent in an audit, then your position is they still would not be liable under the securities laws unless they issued their audits with the Scienter as defined in these cases. Absolutely, and that is the express holding of what I think is the most on-point case, the DSAM case from the Ninth Circuit, which says, and I'll just paraphrase a couple of sentences because I think it's directly responsive to your question, Judge Gould. In that case, it said the issue in this case is whether the allegations of a seriously botched audit are sufficient to bleed Scienter under the heightened pleading requirements of the PSLRA and Silicon Graphics. And it goes on to say, we hold that the complaint sets out a compelling case of negligence, perhaps even gross negligence, but does not give rise to a strong inference that the auditor acted with an intent to do fraud, conscious misconduct, or deliberate recklessness as is required in a securities fraud case. So I don't want to be understood for a minute suggesting that I believe that there was anything botched or seriously botched about PricewaterhouseCoopers' conduct in this particular case. But I will say, even if the court were to conclude that, it would not be sufficient to state a claim under DSAM and under the state-of-mind authorities that I've talked about. So what is it that the... Absolutely, and I hope the court won't conclude that as a way of making the point, but I absolutely am of that view, as I think the DSAM case holds explicitly, and it's the opening paragraph in that case. Counsel, can I take you off for just a minute out of your prepared argument? What effect did your indication of a bankruptcy have in terms of the right of the parties to proceed and claims against the state and all of that? Yes. Was there a stay order that barred this case for a while? Yes, there was. Was it lifted? It was ultimately lifted when PHP itself was liquidated and those claims were resolved. Has the bankrupt been discharged? It's been liquidated, yes. And discharged. There are no bankruptcy proceedings. I want to be sure we're not proceeding with a stay order finding us. That's my question. Yes, and let me go through. I think I can answer the question 100%. The initial lawsuit was filed against PHP and some insiders, not PWC. Then PHP went bankrupt and there was an automatic stay in effect. PWC was added to the complaint. We moved to stay pending the outcome of the bankruptcy. The bankruptcy court ultimately – You moved to stay what? Moved to stay the securities class action, this case. Okay. That motion was granted and the stay was in effect for a long time. This is a 1998 case and that's why. Then ultimately PHP was liquidated and the stay was lifted to permit this case to proceed. Right today there's no stay in force and I'm not bound to a bankruptcy court act. Correct. Okay, thank you very much. Let me turn then to what the plaintiffs have alleged in this case. They say that PWC must have known something was up because the KPMG work paper suggested that there were some problems. They say take a look at those. If you go and look at our supplemental excerpts of the record, you will see what it is that we're talking about here. We're talking about an auditor that said we have a concern, after it issued a clean audit opinion, about the decision-making process and the timeliness of reporting. We do not have a concern about the accounting that was done and we stand by our audit opinions. And PHP said that and KPMG said that. So how that might establish scienter on the part of Price Waterhouse coming into this audit, I don't understand. The two other issues that they've raised are, one, combining these two contracts that produce the issue of the $7 million receivable and then the DC charted receivables, which is the other issue that counsel mentioned. Let me talk about both of them, but I should say I think that these are complicated matters and I'll do my best to address them in the time that I have. But frankly, I think they're almost better suited to a written presentation and both Mr. Olson and I have done our best, I think, in the extensive briefs to go through all that. But in a sort of summary fashion, let me say that with respect to the contracts that were combined for revenue recognition purposes, what we're talking about there are two contracts, one to build a series of health care centers and the second to manage those health care centers. PHP had what it called its integrated system of care, I think it was called, which oversaw the development and provision of health care services. And because of that business plan, PHP was involved in a lot of different things, having to do with the construction and the oversight and management of these operations. Price Waterhouse, or sorry, PHP itself believed under the statement of position 81-1 that we've talked about that it was appropriate because these contracts were related, so interrelated with one another, to combine them for purposes of accounting. And we've laid out in great detail in the briefs why that position was taken and the justifications for it. Price Waterhouse, in doing the audit, did not disagree with that position, as KPMG before it had not disagreed. And ultimately, the company was sold, the company that it was managing was sold back to PHP. And at that point, because both contracts had not yet run, there was a need to figure out how to deal with the fact that there was still another substantial receivable coming in, and it was treated as additional non-cash consideration or goodwill, which is, I think, the same discussion we heard about in the prior argument. It is absolutely the right accounting to treat it in that fashion. Even if it were the wrong accounting, however, there is no basis for determining or inferring that there was anything remotely relating to some fraudulent intent going on here. I think in a case like this, if there had been some kind of a meeting where they were told that these contracts were, in fact, not related, but they should be doctored, they should be changed in some fashion, and if Price Waterhouse gave them a wink and a nod and said, well, that's okay, we'll just go ahead and proceed even though we know this is not a correct statement, I wouldn't be standing here defending the case. But what happened is there is a professional judgment disagreement between PHP and PwC and plaintiff's counsel about whether or not that should have been done. All of the issues were disclosed. The fact that these contracts were combined was disclosed. It's all in the year-after-year disclosure documents that are in the record. And ultimately, a decision to restate them was compelled by the SEC because of a disagreement over the accounting, right or wrong. It doesn't show any kind of mental state embracing an intent to defraud. The other principal issue which counsel has identified relates to the receivables from D.C. Chartered, and what we heard about that was that there should have been a disclosure about the fact that they had been impaired because of a study that came out in, I think it was 1997. What is clear from the submissions that we made is the fact that PHP had a contractual arrangement with the District of Columbia to reimburse it at a certain rate based on a study that had been commissioned by the District of Columbia and had been in place for years as the only study and indeed was the one which was used to pay all of the HMOs. And then years later, there was a settlement that was reached in which they agreed to pay not the $9 million that PHP believed it was due, but $18 million. Well, PHP believed it was due $18 million. It had booked conservatively $9 million and had an agreement with the District of Columbia to pay $18 million. So when they said it was conservatively reported, it was to the tune of about $9 or $10 million. Now, what happened is there was a political change in the District of Columbia. You know, it happens from time to time. And a new fiscal officer came in and said that he was going to impose new rules and that he wasn't going to pay in accordance with the previously agreed amount, but rather a different amount. Well, PHP didn't agree with that. And in fact, they filed a lawsuit. And it was a disputed issue. And there was never a restatement over the amount of the receivables. And to this day, it is not even clear on the record whether or not there was ever a penny paid less than PHP was demanding in that situation. All counsel is saying is that PHP should have disclosed the fact of a dispute. And was it reasonably estimable? Was it probable that there was going to be a loss? You know, those are issues around which reasonable people certainly can differ. What I think is very revealing in this case is that there was never a restatement in any way, shape, or form regarding the amount. The only thing that ever happened was that PHP was required to come back and say, by the way, there's a dispute. Now, how that shows PricewaterhouseCoopers was somehow involved or responsible or in cahoots with PHP to do this in some fraudulent, deceptive way, I'm at a loss. The other point, which Mr. Olson didn't argue, but it's in the brief, has to do with the going concern opinion. That they are saying that because PHP went bankrupt in November of 1998, and because there was an audit opinion issued in August of 1998, that PricewaterhouseCoopers somehow should have known, must have known, did know, I guess, that the company was going to go bankrupt four months into the future. And that they should have therefore issued what's called a going concern qualification. That it's not, that there's some reservations about the ability of the company to continue. But as the district court pointed out in the opinion, as we've argued in the briefs, the intervening event after August of 1998 and before November of 1998, was that the company's New Jersey operations were taken over by regulators, which cut off a flow of, I think it was around $20 million a month to the company. And it was the result of that intervening, unforeseen event that the company went bankrupt. So that can hardly be a basis for finding Center. The one last comment I'd like to make, going back to the legal issues, is that on a motion to dismiss, like this one under the PSLRA, the normal legal rules of indulging the reasonable inferences that can be drawn from the plaintiff's complaint don't apply. On a 12B6 motion, typically, if there are inferences to be drawn that can help support a pleading in support of the viability of a complaint, then those can be drawn in plaintiff's favor. However, in the Gomper v. Vizic's case, which I know Judge Nelson was involved in, there was a conclusion reached that because of the special provisions of the PSLRA, that the normal rule that only inferences in favor of plaintiffs be drawn does not apply. And instead, all reasonable inferences, be they favorable or unfavorable to the plaintiff or the defendant, should be considered. And that, I think, applies directly in this case, where we look at a situation and say, what is really going on here? How can we get in the head of the party who's being charged with these wrongs? I mean, in one case, I hear, you know, in a prior case, Pricewaterhouse is a whistleblower. And in this case, it's a co-conspirator because people come up with these different allegations to try to put a spin on what really happened. But what we need to do is to look at what is really alleged here and go in whatever direction those inferences might take us. And here, they cannot get to the point because there is no evidence or no evidence, no allegations of materials which you have proven would show that there was an intent on the part of Pricewaterhouse to engage in conscious, intentional misconduct, which is required under 10b. So with that, I see I'm 10 seconds over. Thank you very much. Okay, well, we appreciate the honor. Now, Mr. Olson, questions having concluded, do you have something to add? I do, Your Honor. Very quickly. First of all, in terms of the documents that we got through the bankruptcy process, we did not get any discovery from PricewaterhouseCoopers. What happened was, two weeks before our amended complaint was due, the trustee granted us access to a very large and dingy warehouse in Patterson, New Jersey, and we descended upon it. So we haven't taken any discovery of PricewaterhouseCoopers. There were some documents that were obviously mixed in there that we were able to obtain and have attached to our complaint. Secondly, the district court did not address many of the detailed allegations that we pled. And I would note that counsel did not dispute the June 19, 1997, memorandum PwC agenda at ER 288, where we specifically allege that demonstrates actual knowledge that it was improper to treat that $7.7 million receivable from Blue Cross Blue Shield of New Jersey as an intangible asset. And the SEC later forced the company to restate that on the same principle. And so there is no dispute about that. They don't dispute it in their brief, and they don't dispute it here. Third, this is not just an issue about a botched audit. And we plead, and nor is it an issue of PwC doing its job. I would note that in Ray Homestore, in the district court's opinion there, PwC made the same argument that all the evidence showed was that they were doing their job. And what the court noted is, ironically, that also shows scienter for pleading purposes, because as this court noted in Dow Systems, that particularized allegations of gap violations provide strong evidence of scienter. Finally, our two last points, Your Honor. We pled in our briefs that this case is much different than DSAM. All that DSAM was about was that PricewaterhouseCoopers, which itself initiated the restatement, whereas here this is an SEC-mandated restatement. That's a qualitative difference. The plaintiffs allege that PwC had the very documents which, if they read properly, would have showed them that they were in violation. We allege far more than that, Your Honor. We have pled, for instance, with the June 1997 memorandum, that PwC actually knew that it was improper. And in terms of the DC receivable, we plead and specific evidence that they actually were told by the district that that receivable wouldn't be paid. This is not just like they failed to see the obvious. We are pleading that they took a position that no reasonable accountant, faced with the same facts, would have come to the same conclusions. SOP 81-1 is not complicated, and we've alluded to that or stated that in our brief and demonstrated how. Neither is FAS 5. FAS 5 is very simple, longstanding. And I would conclude with this statement in terms of PwC's state of mind. And this is from their proposal to serve as PHP's auditor, and it's at ER 137. This is what PwC stated. Advocacy, our service philosophy. We will always view our role as auditors and advisors to PHP as that of a business advocate. Helping management achieve its business objectives, while at the same time providing the independent perspective necessary to support your decision-making process. That was the same decision-making process that KPMG issued a reportable condition letter and refused to audit further. And you can see that all the positions that PwC took inflated PHP's reported revenues, earnings, and assets. Thank you, Your Honor. The time has concluded. There's no arguments on both sides. We appreciate your time with us. The case of Broderick v. Price Waterhouse shall be submitted, and the court will now adjourn. All rise. The court for this session stands adjourned. Thank you. Thank you. Thank you. Thank you.
judges: Beezer, Gould, T. Nelson